UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| WILLIAM BIAS,<br><br>                      Plaintiff,<br><br>     v.<br><br>WYNN ROBISON, SID D. BROWN,<br>MADISON COUNTY, AND CITY OF<br>REXBURG POLICE DEPARTMENT,<br><br>                      Defendants. | Case No. 4:19-cv-00280-REB<br><br>**MEMORANDUM DECISION AND<br>ORDER RE: DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT<br>(DKT. 51)** |

Defendants Wynn Robison and City of Rexburg Police Department ("RPD") have filed a motion for Summary Judgment (Dkt. 51). (Defendants Sid D. Brown and Madison County do not join the motion.) That motion is decided here. The Court also resolves here Plaintiff's Memorandum in Support of Continuing Summary Judgment (Dkt. 58), which was not directly connected to a motion in the docket, and Defendants' oral motion to strike Plaintiff's response to their summary judgment motion. Such oral motion was made during the hearing on the motion for summary judgment held July 28, 2020, when Defendants learned that Plaintiff had untimely filed his response earlier that same day, after the hearing had commenced. Having reviewed the briefing and supporting filings, considered the oral argument of the parties, and otherwise being fully advised, the Court enters the following Decision and Order.

## BACKGROUND

Plaintiff William Bias filed his Verified Complaint on July 18, 2019, seeking declaratory, injunctive, and monetary relief. (Dkt. 1). His grievances stem from his 2012 arrest, by

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 1**

Defendant Officer Robison[1] of the Rexburg Police Department, and a subsequent prosecution for felony DUI, by Defendant Sid. D. Brown and Madison County.  Plaintiff pled guilty to the charge and was sentenced to a unified term of ten years in prison, five of which were determinate.  After serving approximately four years and six months of his sentence, Plaintiff prevailed on a post-conviction relief case he had filed and he was released from prison.

Plaintiff's post-conviction relief claim alleged ineffective assistance of counsel based upon Plaintiff's contention that his defense counsel in the underlying criminal case should have challenged the legal basis for the traffic stop and should have moved to suppress evidence that resulted from that stop.  At an evidentiary hearing held in the post-conviction relief case, Plaintiff learned for the first time that there was dashcam video of the stop.  Relying upon the video, the state district judge in that case concluded that Officer Robison lacked reasonable suspicion to stop Plaintiff and the traffic stop therefore violated Plaintiff's constitutional rights.  The decision was affirmed by the Idaho Court of Appeals.

Plaintiff raises six claims in this federal court case, under 42 U.S.C. § 1983.  Count One, against Robison, alleges unlawful arrest.  Counts Two, Three, and Four allege claims against other Defendants and are not implicated in the instant motion for summary judgment.  Count Five, against RPD, alleges liability under a *respondeat superior* theory, a failure to train theory, and/or a *Monell* municipal liability[2] claim.  Count Six, against both Robison and RPD as well as

---

[1] Plaintiff identifies the Officer as "Wynn Robinson," but Defendants' filings consistently identify him as "Wynn Robison," including in a declaration he signed in support of the instant motion (Dkt. 51-4).  There does not appear to be any disagreement that both references are to the same person.  The Court will use the Defendants' spelling.

[2] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 2**

Brown and Madison County, alleges a *Brady* violation[3] for failure to disclose the video of the traffic stop.

Ten months after the case was filed, on May 26, 2020, Defendants Robison and RPD moved for summary judgment, seeking dismissal of all counts against them. Defendants Brown and Madison County did not join the motion. Plaintiff's response in opposition to the motion was due June 16, 2020. Plaintiff did not file a response before or within a week after such deadline, whereupon Defendants filed a "Notice of Non-Opposition" on June 23, 2020, pointing out Plaintiff's lack of any timely response (Dkt. 57).

On June 24, 2020, Plaintiff filed a "Memorandum in Support of Continuing Summary Judgment" (Dkt. 58). Plaintiff stated additional discovery was required to respond to Defendants' summary judgment motion and that his untimeliness in responding to the motion should be excused. The memorandum further averred that Plaintiff's counsel believed the deadline to respond to the summary judgment motion was tied to a hearing date on the motion, which Plaintiff's counsel said was the procedure in Idaho state courts.

Plaintiff also contended that the summary judgment decision should be continued because it should be decided on the merits rather than on procedural issues. Separately, he argued that his request to defer consideration of the summary judgment motion was "timely because no trial date has been set in this matter and the cutoff date for discovery is September 1st, 2020 with a dispositive motion deadline of October 1st, 2020."

Attached to the memorandum was an affidavit of counsel (Dkt. 58-1). However, Plaintiff did not file a motion in conjunction with the memorandum, either contemporaneously or at any time since.

---

[3] *See Brady v. Maryland*, 373 U.S. 83 (1963).

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 3**

Two days later, Defendants filed an opposition to Plaintiff's memorandum (Dkt. 59), pointing to the absence of a motion accompanying the memorandum and reiterating their argument of untimeliness.  As to Plaintiff's claim of the need for additional discovery to respond to their motion, Defendants said that as of the filing date, Plaintiff had not served "a single interrogatory, request for production, or request for admission on any of the Defendants," nor had Plaintiff attempted to set any depositions in the matter.[4]

Defendants further argued that Plaintiff could not show that any evidence that might be discovered would prevent summary judgment and argued that Defendants would suffer prejudice if consideration of the summary judgment motion was deferred.[5]

At 10:43 a.m. on July 28, 2020, Plaintiff filed a memorandum in response to Defendants' summary judgment motion.  Such memorandum was filed _after_ the hearing on the motion already had begun.  As such, neither Defendants nor the Court were immediately aware of its filing, nor had an opportunity to review its contents prior to (or during) the hearing.  Nevertheless, Plaintiff's counsel discussed the contents of the memorandum and the circumstances of its filing during the hearing.  Counsel represented to the Court that the memorandum had been prepared before the date of the hearing, that he thought the memorandum had been filed several weeks prior to the hearing, and that he told his staff to file it on the day of the hearing after he learned that same morning that it had not yet been filed.  He admitted that even if the memorandum had been filed weeks earlier, it still would have been untimely.  But, he

---

[4] At the hearing on the instant motion, Plaintiff said that he had set depositions.  The docket bears this out; on July 6, 2020 (after Defendants had filed their opposition to Plaintiff's memorandum) Plaintiff filed two notices of depositions (Dkts. 60, 61) despite the direction of Local Civil Rule 5.4 that such discovery "notice" documents are not to be filed with the court.

[5] The Court will not consider Defendants' informal request for attorney fees, because it was not brought by written motion as required by Federal Rule of Civil Procedure 7(b)(1).

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 4**

argued that the response addressed facts that he had learned only when Defendants updated their initial disclosures, which he said occurred after the response deadline had already passed.  When the Court requested more detail about when the memorandum had been prepared, he said it had been completed and was ready to file in "early July."  The memorandum, however, does not support that position, as not only was it not filed until July 28, 2020, the signature date dates back only to July 17, 2020.[6]

Defendants made an oral motion to strike Plaintiff's just-filed response memorandum as untimely, highlighting that it was filed over a month after the response deadline had lapsed.  This oral motion was proper under Federal Rule of Civil Procedure 7(b) because it was "made during a hearing."

## LEGAL STANDARDS

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id.* at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."

---

[6] Moreover, the Certificate of Service attached to the memorandum indicates it was served on July 28, 2020 – the day of the hearing.

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 5**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case."  *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings.  *See id*. at 255.  Direct testimony of the non-movant must be believed, however implausible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the court is not required to adopt unreasonable inferences from circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor.  *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her . . . affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  However, the court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  Instead, the "party opposing summary judgment must direct [the court's] attention to specific, triable facts."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

In the context of a summary judgment motion, if a nonmovant shows it cannot present

facts essential to justify its opposition, the court may defer considering the motion or allow time to take discovery.  Fed. R. Civ. P. 56(d).

## DISCUSSION

**1. The Court Will Not Defer Consideration of Defendants' Summary Judgment Motion.**

As recounted above, Plaintiff seeks deferral of Defendants' motion so that he may pursue additional discovery in order to respond fully to the motion.  The rules allow for such a request in the form of a motion under Federal Rule of Civil Procedure 7(b).  However, even if it had been properly presented as a motion, such a motion would be untimely.   Local Civil Rule 7.1(c)(1) required that Plaintiff respond to Defendants' motion for summary judgment "within twenty-one (21) days after service upon [Plaintiff] of the memorandum of points and authorities of the moving party."  Defendants' motion and accompanying papers were filed and served on May 26, 2020.  Plaintiff's response was therefore due June 16, 2020, which is precisely what the docket text accompanying the motion indicates.  Plaintiff not only did not respond to the motion by that date, his request to defer consideration of the motion was not filed until June 24, 2020, eight days after the deadline.

Plaintiff, however, asks the Court to treat his "request" as timely because no trial date had yet been set and the deadlines for discovery and the filing of dispositive motions had not yet lapsed.  He also contends that at a status conference with the Court and Defendants he "specifically mentioned and put the Defendants and the Court on notice that he intended to respond" to Defendants' motion.  His attorney says that he believed the response deadline was tied to a hearing date on the motion, because – he says – that is how things are done in state court.  None of these arguments is availing because Plaintiff did not file a response to Defendants' motion before the deadline to do so lapsed.  Moreover, the suggestion that this

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 7**

federal court should ignore its own rules because counsel has not followed them based upon counsel's assumption that state court rules were identical to federal court rules on this subject simply carries no weight.  Especially in the realm of dispositive motions, knowledge of the applicable rules is fundamental to what is expected of counsel who appear in this court, just as it is for counsel who appear in state court.

Whatever the reason for the untimeliness, however, there is a tilt in the law related to such matters which encourages decisions on the merits when a failure to follow the procedural rules has created a dilemma for the non-movant, such as here.  *See, e.g., Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986).  But that tilt does not swallow the rules of procedure; rather, a court must exercise its discretion upon such matters based upon the context, including where things are in the progress of the lawsuit, to evaluate whether an untimely filing should be considered.  A scheduling order duly entered under Federal Rule of Civil Procedure 16 "may be modified only for good cause."  Per Local Civil Rule 6.1, "[a]ll requests to extend briefing periods or to vacate or reschedule motion hearing dates . . . . will be granted only upon a showing of good cause."[7]  More generically, Federal Rule of Civil Procedure 6(b)(1)(B) provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."

Nothing in Plaintiff's argument establishes either good cause or excusable neglect with respect to Plaintiff's untimely – and procedurally misplaced – request to defer considering Defendants' summary judgment motion.  Plaintiff's reliance on a policy preference to resolve

---

[7] Defendants argue that the jurisprudence describing the "good cause" standard of Rule 16 applies equally to requests under Local Civil Rule 6.1.  The Court need not and does not reach this question.

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 8**

issues on the merits goes too far on these facts.  Indeed, the case quotation that appears in Plaintiff's own briefing makes clear that even though such a policy *favors* resolution on merits, it does not *require* decisions on the merits.  That is, the policy "tilts the table" toward overlooking noncompliance with procedural rules, particularly when doing so is in accord with the Rule 1 admonition that the rules "should be construed, administered, and employed . . . to secure the just, speedy, and inexpensive determination of every action and proceeding."  But the policy does not require a court to ignore any and all rule violations whatsoever.  In this instance, Plaintiff has simply not shown that his untimely filing was sufficiently justified such that it should be considered despite its untimeliness.  The Court will not defer considering Defendant's summary judgment motion.

Because Plaintiff's "request" was neither timely nor procedurally correct, the Court will not consider the merits of the request under Rule 56(d), which would be the source for the relief Plaintiff seeks.  Even so, the Court would deny the request if it were both timely and procedurally proper, for the reasons that follow.

The Court's consideration of a Rule 56(d) is a matter of discretion.  *Michelman v. Lincoln Nat. Life Ins. Co.*, 685 F.3d 887, 892 (9th Cir. 2012).  One factor considered is the movant's diligence: "We will only find that the district court abused its discretion if the movant diligently pursued its *previous* discovery opportunities, and if the movant can show how allowing *additional* discovery would have precluded summary judgment."  *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) (Emphasis in original.).[8]  But, as described by Defendants in their moving papers, the case was filed on July 18, 2019 and the motion for summary

---

[8] Rule 56(d) was previously numbered 56(f), thus some previous case law – including *Qualls* – refers to 56(f).  But the rule is substantially the same.

judgment was filed in May 2020, nearly ten months later.  Yet by the time the motion for summary judgment was filed, Plaintiff had not served "a single interrogatory, request for production, or request for admission on any of the Defendants."  The record shows that Plaintiff set two depositions in July 2020, but those settings were not made until *after* the expiration of Plaintiff's deadline to respond to the motion.  Moreover, nothing in the record indicates Plaintiff otherwise attempted to take any discovery earlier than July 2020.  The Court concludes that Plaintiff was not diligent in "pursu[ing] … previous discovery opportunities" and thus a request to defer under Rule 58(f) would be denied even if it were otherwise proper.

**2. Defendants' Oral Motion to Strike Plaintiff's Response Memorandum Is Denied.**

Plaintiff filed a memorandum in opposition to a motion for summary judgment that was already untimely, while a hearing upon that motion was underway.  Defendants claim surprise and prejudice as a result.

Nonetheless, having initially reviewed the filing for the purpose of evaluating whether it should be stricken, the Court will deny the motion to strike and the Court will consider the filing. Moreover, the Court finds that although Defendants did not have a meaningful opportunity to reply to the contents of the memorandum, there is no substantial prejudice by the consideration of the response memorandum in light of the Court's ruling on their motion for summary judgment, as further discussed below.

**3. Defendants' Summary Judgment Motion Is Granted.**

    a.  <u>Defendant Robison Is Entitled to Qualified Immunity.</u>

Defendant Robison claims the benefit of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted).

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell*

*v. Forsyth*, 472 U.S. 511, 526 (1985).  Thus, its protection "is effectively lost if a case is

erroneously permitted to go to trial." *Id.*  For this reason, the Supreme Court has "repeatedly . . .

stressed the importance of resolving immunity questions at the earliest possible stage in

litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

The defense of qualified immunity requires the trial court to consider two questions.

First, has plaintiff sufficiently alleged a violation of a constitutional right.  *Pearson*, 555 U.S. at

232.  Second, was the alleged constitutional right a "clearly established" right at the time of the

defendant's alleged misconduct.  *Id.*  The steps may be considered in either order.  *Id.* at 236.

A constitutional right is "clearly established" when it is so "sufficiently clear that every

reasonable official would [have understood] that what he is doing violates that right."  *Reichle v.*

*Howards*, 566 U.S. 658, 664 (2012) (alteration in original; internal quotation marks omitted).

That is, "existing precedent must have placed the statutory or constitutional question beyond

debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  The defense of qualified immunity

protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986), and shields an officer from personal liability "when an officer

reasonably believes that his or her conduct complies with the law." *Pearson*, 555 U.S. at 244.

Here, the issue of qualified immunity turns upon the facts of the 2012 traffic stop

measured against existing precedent.  When he made the traffic stop, Defendant Robison

contends he had reasonable suspicion that Plaintiff was driving under the influence of alcohol.

Accordingly, he says, he is entitled to qualified immunity both because there was no violation of

Plaintiff's constitutional rights and, even if there was any such violation, the right at issue was

not clearly established at the time of the stop.

Plaintiff disagrees, contending that the traffic stop violated his "clearly established" Fourth Amendment right to be free from unreasonable searches and seizures.  Plaintiff contends the Idaho Supreme Court ruled that a dashcam video of the stop showed that Defendant Robison lacked reasonable suspicion for the stop.  (The Court notes that Plaintiff's civil post-conviction relief case was decided at the appellate level by the Idaho Court of Appeals, not the Idaho Supreme Court.  *See Bias v. State*, 427 P.3d 830 (Idaho App. 2018).)  The Idaho Court of Appeals affirmed the trial court's ruling that the stop was not supported by reasonable suspicion.

The evidence of record includes a declaration by Defendant Robison, in which he says that Plaintiff "was driving approximately ten miles an hour under the speed limit" and "was weaving in his lane of travel, drove on top of the fog line for a time, and braked as he entered a soft curve."  Robison Decl. ¶ 6 (Dkt. 51-4).  Also in the record is a declaration by Shane Turman, the Rexburg Chief of Police, in which he says that "[p]rior to the Idaho Supreme Court's decision in *State v. Neal* in 2015, it was widely believed, and our officers were trained, that driving on the fog line could be used to form reasonable suspicion for a traffic stop."  Turman Decl. ¶ 9 (Dkt. 51-5).[9]  Finally, the record includes an excerpt of a deposition Defendants took of Plaintiff in which Plaintiff admits that he "touched" the fog line prior to the traffic stop.  Bias Dep. pp. 82:9–19 (Dkt. 51-3).

Plaintiff did not contest the factual background presented by Defendants in their motion for summary judgment, nor did he file a separate statement of disputed material facts as required by Local Civil Rule 7.1(c)(2).  Instead, Plaintiff's response memorandum says that "because the

---

[9] Chief Turman's declaration indicates that Defendant Robison's police report and a copy of the dashcam footage regarding Plaintiff's traffic stop are attached to the declaration, but such attachments do not appear on this case's docket.

facts have been previously litigated and upheld by the Idaho Supreme Court, Defendants have no ability to relitigate the underlying case giving rise to the instant action.  Plaintiff has addressed this at length in his Motion *in Limine* and Motion for Judicial Notice, so it will not be restated here."

Plaintiff presumably intends to rely upon the Idaho Court of Appeals decision mentioned *supra*.  These circumstances all combine to place Defendants' motion for summary judgment in a procedurally unusual position.  The factual evidence before the Court is that Defendant Robison's traffic stop of Plaintiff was supported, in part, by Plaintiff's having touched the fog line.  But, the Idaho Court of Appeals affirmed the Idaho district court's conclusion that the stop was constitutionally improper.  Hence, the Court will treat this particular piece of the puzzle – the first step of the analysis – as in equipoise.  It is the second step of the analysis which then steers the Court's ruling.

As described earlier on, the second step of the qualified immunity analysis requires that the constitutional right allegedly violated was "clearly established" at the time of the Defendant's conduct.  Defendants say no – it was not clearly established in 2012 that a driver on an Idaho road had a constitutional right to drive on the fog line.  Chief Turman's declaration indicates that prior to a change in the law in 2015, "it was widely believed, and our officers were trained, that driving on the fog line could be used to form reasonable suspicion for a traffic stop."  Turman Decl. ¶ 9 (Dkt. 51-5).  Defendants note that the change in law effectuated by the Idaho Supreme Court in *State v. Neal*, 362 P.3d 514 (2015), was not a unanimous decision but was instead a 3-2 decision that included a written dissent.  Defendants contend that "[i]f two Idaho Supreme Court Justices felt that this right was not clearly established in 2015, it is impossible for Plaintiff to show that it was clearly established in 2012."

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 13**

Plaintiff argues that the focus on whether he had a constitutional right to drive on the fog line is too narrow, framing the constitutional right at issue instead as the Fourth Amendment's broad protection of the right to be free from improper searches and seizures.  He then reiterates the holding from his Idaho post-conviction relief case that the traffic stop was not supported by reasonable suspicion.  He contends that "[c]learly established law indicates that no reasonable officer would have stopped a vehicle without probable cause or reasonable suspicion."  But that argument is circular; the fact that a court later concluded the stop was not supported by reasonable suspicion does not per se mean that it was clearly established at the time of the stop that the stop was improper.

In the Court's reading of *State v. Neal*, 362 P.3d 514 (2015), the Idaho Supreme Court clearly ruled (in a different case than Plaintiff's, several years after his 2012 traffic stop) that the reasons Defendant Robison described as creating reasonable suspicion of DUI at the time of the traffic stop in this case, did not justify a traffic stop and therefore the traffic stop would constitute a seizure in violation of the driver's Fourth Amendment rights – so long, that is, as the stop were to have occurred after the *Neal* decision was issued.  Consider this portion of the court's ruling in *Neal*:

> We agree with the trial court and the district court. Without more, the two instances of moving onto the fog line are not sufficient to arouse reasonable suspicion of DUI under Idaho precedent. *See id.* ("[T]he fact that the stop occurred in the early morning hours does not enhance the suspicious nature of the observation. . . . Emory's vehicle was in its proper lane and was moving in a straight line down the street. No weaving or crossing of the center dividing line was observed by the officer. Such conduct can hardly be described as suspicious."); *State v. Flowers*, 131 Idaho 205, 209, 953 P.2d 645, 649 (Ct. App. 1998) (upholding the magistrate court's conclusion that "While any one of the factors identified . . . may not have given rise to a reasonable suspicion standard, all of them taken together do so. The Defendant's slow speed, hugging of the fog line, weaving in his lane of travel, crossing the fog line to the width of a tire, and then moving left to touch the center line one or two times, all within a mile or two, give rise to reasonable suspicion.").

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 14**

The mere touching of lines on roadways does not constitute reasonable suspicion of DUI in other jurisdictions either. *See United States v. Colin*, 314 F.3d 439, 446 (9th Cir. 2002) (car's touching the right fog line and the center yellow line each for ten seconds after legitimate lane changes did not give officer reasonable suspicion of driving under the influence); *United States v. Freeman*, 209 F.3d 464, 466–67 (6th Cir. 2000) (a motor home's brief entry into the emergency lane does not constitute probable cause that the driver was intoxicated); *United States v. Lyons*, 7 F.3d 973, 976 (10th Cir. 1993), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783, 786–87 (10th Cir. 1995) ("[I]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an invasion of their privacy."); *United States v. Wendfeldt*, No. 3:11-CR-00094-LRH, 2014 WL 5822804, at *3 (D. Nev. Nov. 7, 2014) ("Although Wendfeldt's right tires touched the fog line several times, he was not speeding or driving erratically in any way, and his driving posed no danger to any other motorists."); *United States v. Ochoa*, 4 F. Supp. 2d 1007, 1012 (D. Kan. 1998) (single drift onto the shoulder did not justify stopping defendant); *State v. Tague*, 676 N.W.2d 197, 205–06 (Iowa 2004) (single incident of crossing left edge line for a brief moment did not meet reasonableness test under the state constitution); *State v. Binette*, 33 S.W.3d 215, 219–20 (Tenn. 2000) (occasional drifting from the center of the lane did not amount to reasonable suspicion). Two instances of driving onto the fog line do not create a driving pattern that justifies an investigatory stop of the vehicle for suspicion of DUI.

*Neal*, 362 P.3d at 518–519.

The critical distinction is exactly that which Defendants emphasize – the *Neal* decision was issued nearly three years after the traffic stop at issue in this case.  Further, although the majority decision in *Neal* said that "[w]ithout more, the two instances of moving onto the fog line are not sufficient to arouse reasonable suspicion of DUI under Idaho precedent" and then referenced several other cases involving reasonable suspicion to support a traffic stop, there is nothing in the other decisions described in *Neal* that clearly apply to the facts in this case. Hence, the Fourth Amendment prohibition under Idaho law against a traffic stop based upon the facts relied upon by Defendant Robison in this case was not clearly established until November 4, 2015, when the Idaho Supreme Court issued its decision in *Neal*.

Defendant Robison is entitled to qualified immunity because there was no "clearly established" right for Plaintiff, and any other motorist on an Idaho road, not to be stopped under

the circumstances of this case.  The evidentiary record lacks any suggestion that Defendant

Robison did not reasonably believe the stop was lawful.  *See Pearson*, 555 U.S. at 244.  The

record likewise lacks any suggestion that Defendant Robison was "plainly incompetent" or

"knowingly violate[d] the law."[10]  *See Malley*, 475 U.S. at 341.  But most significantly, to the

extent Defendant Robison's justification for the stop was supported by Plaintiff having touched

the fog line, the 2015 *Neal* decision proves that this is not a case where "existing precedent [had]

placed the statutory or constitutional question beyond debate" because that precedent was not

issued until three years *after* the conduct at issue.  *See Ashcroft*, 563 U.S. at 741.

 Accordingly, whether there was a constitutional violation at all, under the first step of the

qualified immunity test, does not need to be – and is not – resolved in this decision.[11]  Count One

of Plaintiff's Complaint will be dismissed with prejudice.

  b. <u>Count Five Is Dismissed.</u>

 Count Five of Plaintiff's Complaint alleges that Defendant RPD "knew or should have

known, that their officers were continually filing false police reports, that did not provide

accurate details of traffic stops as showed by video footage of stops.  Defendant [RPD] knew or

should have known, that they possessed these videos and failed either in policy or training to

---

  [10] Plaintiff's Complaint alleges that Defendant RPD has tolerated its police officers
"falsifying police reports" (¶ I.1), that Defendant Robison acted "maliciously" (¶ V.2), and that
Defendant RPD "knew or should have known, that their officers were continually filing false
police reports, that did not provide accurate details of traffic stops as showed by video footage of
stops" (¶ IX.2) (Dkt. 1).  None of these allegations are supported by the evidentiary record before
the Court, however, so they will not be further discussed or considered.

  [11] The Court notes that Plaintiff has argued in a subsequent motion that Defendants are
precluded from arguing the stop was proper.  But the issue of preclusion was not briefed in the
record of the instant motion (or before such motion became ripe), and it will not be considered
here.  Regardless, the preclusion argument would not affect the Court's holding under the second
step of the qualified immunity test.

produce these to the Prosecutor as part of discovery.  As a proximate result of Defendant

[RPD's] violation of Plaintiff's due process and civil rights, Plaintiff was greatly humiliated,

injured in his reputation, suffered financial loss, mental anguish, and loss of personal freedom."

Compl. ¶¶ IX.2, 3 (Dkt. 1).

In seeking to dismiss this cause of action, Defendants suggest that Plaintiff may be

alleging liability under a *respondeat superior* theory of liability, a failure to train theory of

liability, and/or a theory of municipal liability arising under *Monell v. Dep't of Soc. Servcs.*, 436

U.S. 658 (1978).  They challenge each theory of liability separately.

Defendants draw upon cases holding that "[m]unicipalities, their agencies, and their

supervisory personnel cannot be held liable under section 1983 on a theory of *respondeat*

*superior*."  *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 610 (9th Cir. 1986)

(citing *Monell*, 436 U.S. at 690–691).  Plaintiff offers no counter to this argument, on these facts.

Accordingly, and consistent with binding precedent, Count Five will be dismissed to the extent

that it states a claim based on a *respondeat superior* theory of liability.

Next, Defendants challenge Count Five as to a "failure to train" theory.  In claims against

a municipality, "the inadequacy of police training may serve as the basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of persons with whom

the police come into contact," and the policy was "the moving force [behind] the constitutional

violation."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (alteration in original; internal

quotation marks omitted).  The Supreme Court emphasized that "the need for more or different

training [must be] so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been

deliberately indifferent to the need."  *Id.* at 390.  "'Deliberate indifference' is a stringent standard

of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). Additionally, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Defendants argue that even if there was an underlying constitutional violation, Plaintiff has not provided any evidence that the violation resulted from a failure to train.  They note specifically that Plaintiff has not shown a pattern of similar constitutional violations.

Plaintiff does not dispute that the evidence shows Defendant Robison was trained and that he acted in accordance with his training – in fact, Plaintiff emphasizes such training.  His opposition to dismissal of the failure to train theory turns on his position that Defendant Robison made an improper stop despite his training.  Plaintiff contends that because Robison was acting consistent with his training when he unlawfully stopped Plaintiff, his training was necessarily inadequate.  Plaintiff represents that a report by Defendants' expert Edward Flosi states that the stop was valid and consistent with 2012 law enforcement practices, but such report is not in evidence and therefore any references to it will not be considered.  Additionally, Plaintiff emphasizes his position that "[i]t is undisputed that Officer Robison made an improper stop." Plf.'s Resp. 11 (Dkt. 62).  His memorandum makes clear that he believes the legality of the stop is beyond dispute because that issue was litigated in a prior proceeding.  But, as of the time that this motion became ripe for decision, Plaintiff had not properly established in this proceeding that Defendants are precluded from litigating issues that may have been decided in any prior

proceedings.  Defendants plainly do contend the stop was a legal stop, under then-existing law.[12]

Resolution of Defendants' argument to dismiss Count Five as to a failure to train theory does not require resolving whether the stop was lawful and, as described above, that issue is not decided at this time.  What evidence there is in the record shows that at the time of the stop, Defendant Robison was POST certified, had completed all relevant required training, and believed that driving on the fog line could support reasonable suspicion for a traffic stop. Robison Decl. ¶¶ 3, 4, 7 (Dkt. 51-4); Turman Decl. ¶¶ 4, 5, 9 (Dkt. 51-5).  The record also shows that both Defendant Robison and Police Chief Turman (who says he reviewed Defendant Robison's police report and the dashcam video) believed the stop was justified by reasonable suspicion per the legal standards then applicable.  Robison Decl. ¶ 7 (Dkt. 51-4); Turman Decl. ¶¶ 9–14 (Dkt. 51-5).

Nothing in the record shows a pattern of similar constitutional violations, which is "ordinarily necessary" to support a failure to train claim.  Plaintiff may infer that if his stop was unlawful yet consistent with training, then other stops of other individuals may also have been unlawful yet consistent with training.  But he does not offer any evidence to support that inference.  More significantly, the limited evidence of record shows that the common understanding of law enforcement personnel at the time was that driving on the fog line – which, again, Plaintiff admitted in his deposition to doing – could support a finding of reasonable suspicion.  It was not obvious in 2012 that driving on the fog line cannot be a factor supporting a lawful traffic stop.  Thus, Plaintiff's failure to train theory is destined to fail because he has offered no evidence that Defendant RPD had any notice that its training was deficient.  Nor has

---

[12] Elsewhere in Plaintiff's response memorandum he says that "[i]t is undisputable that Officer Robison made an improper stop of William Bias' vehicle without reasonable suspicion…"  Plf.'s Resp. 11 (Dkt. 62).

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 19**

Plaintiff articulated any other way in which Defendant RPD's training may have been deficient. Plaintiff simply cannot show on these facts that Defendant RPD was "deliberately indifferent" to his rights under a failure to train theory.

Plaintiff's argument that his failure to train theory should survive because Defendant Robison's unlawful stop was consistent with training is not well-taken.  It is simply not the case that a plaintiff may recover under a failure to train theory in every case where a constitutional violation occurs despite the state actor's conduct having been consistent with his or her training:

> It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.
>
> . . . .
>
> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. *See Oklahoma City v. Tuttle*, 471 U.S., at 823 (opinion of Rehnquist, J.). Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*, 436 U.S., at 693–694. It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism. *Cf. Rizzo v. Goode*, 423 U.S. 362, 378–380 (1976).

*City of Canton*, 489 U.S. at 391 (1989).

For these reasons, Count Five will be dismissed to the extent that it states a claim based on a failure to train theory of liability.

Next, Defendants challenge Count Five as to a *Monell* theory of liability.  There are three

ways a plaintiff may pursue a Section 1983 claim under *Monell* and its progeny.  First is a showing that official policy or longstanding custom caused a deprivation of constitutional rights. Second is a showing that an official with final policymaking authority made a decision which caused a deprivation of constitutional rights.  Third is a showing that an official with final policymaking authority ratified a subordinate's decision and the basis for it, thus causing a constitutional deprivation.  *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996) (holding modified by *Navarro v. Block*, 250 F.3d 729 (9th Cir.2001)).

Although a constitutional violation must result from "official municipal policy," a municipality need not expressly adopt the policy, as it can exist pursuant to a "longstanding practice or custom."  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Trevino*, 99 F.3d at 918.  In other words, an unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice.  *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)).

Defendants seek dismissal of Count Five because Plaintiff has not offered evidence of a policy, practice, or custom that allowed for violations of Plaintiff's constitutional rights. Defendant Robison was not, they contend, an "official with final policymaking authority." Plaintiff argues, on the other hand, that Police Chief Turman had final policy making authority for Defendant RPD.  Chief Turman's declaration in the record states that "[t]he City of Rexburg Police Department's policy does not allow unlawful traffic stops.  The official policy requires that officers have reasonable suspicion prior to initiating a traffic stop."  Turman Decl. ¶ 8 (Dkt.

51-5).  However, his declaration further states that "[p]rior to the Idaho Supreme Court's decision in *State v. Neal* in 2015, it was widely believed, and our officers were trained, that driving on the fog line could be used to form reasonable suspicion for a traffic stop."  *Id.* at ¶ 9.  Finally, Chief Turman states that based upon his 31 years of law enforcement experience and upon reviewing Defendant Robison's police report and dashcam video, he believed that the stop was lawful.  *Id.* at ¶¶ 13, 14.  Notably, the summary judgment record does not contain a policy manual or any other official statement of policy besides Chief Turman's declaration.[13]

Count Five of Plaintiff's Complaint does not allege that the traffic stop was effected pursuant to a policy, practice, or custom.  Defendants have put forth evidence that the official policy was to initiate traffic stops only on reasonable suspicion.  It then became Plaintiff's burden to show, with evidence, that what Plaintiff contended was a stop made without reasonable suspicion was the product of an official policy, practice, or custom.[14]  Plaintiff has not carried that burden.

Implicit in Plaintiff's argument is the idea that there was a policy, practice, or custom of initiating traffic stops based on a driver's touching the fog line.  But Plaintiff does not argue – let alone cite supporting evidence as he must for the claim to survive summary judgment – that any such policy, practice, or custom was so "persistent and widespread" that it constitutes a "permanent and well settled" practice under *Monell*.  Nor does he argue, or cite evidence, that

---

[13] Plaintiff's response refers to an "Expert Opinion of Edward Flosi" as well as a "post-conviction relief transcript from Officer Wynn Robison, Officer Charles Kunsaitis, and Officer Richard Schmidt, January 12, 2017."  Plf.'s Resp. 15 (Dkt. 62).  But such materials are not in the evidentiary record before the Court.  Plaintiff's response also refers to his Idaho Court of Appeals case, but that case did not consider whether his traffic stop was the product of an official policy or custom.

[14] Again, this assumes for the sake of argument that the stop itself was unlawful – an issue the Court does not reach.

**MDO Re: Defendants' Motion for Summary Judgment (Dkt. 51) – 22**

the practice was "of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy" under *Trevino*.  Even viewing the evidence in the light most favorable to Plaintiff, there is simply no showing of a policy, practice, or custom to survive summary judgment.  Stated differently, Plaintiff has failed to "direct [the court's] attention to specific, triable facts," *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003), and summary judgment is therefore proper.

Plaintiff's request to defer consideration of Defendants' summary judgment motion was premised, in part, on a desire to have adequate time to obtain information in discovery that may have enabled him to support his argument more strongly.  But, as Defendants have noted, this case was filed more than ten months prior to Defendant's motion for summary judgment and Plaintiff did not serve any discovery requests or seek to set any depositions until after the motion was filed.  Moreover, his request to defer consideration of the motion was both untimely and procedurally improper.  The Court will not assume what might be shown by the evidence Plaintiff would like to gather.

Defendants have shown that there is no genuine dispute of material fact as to a *Monell* theory of liability under Count Five.  They have likewise shown there is no genuine dispute of material fact as to the alternative theories of liability under Count Five.  Accordingly, they are entitled to summary judgment as a matter of law on Count Five and it will be dismissed with prejudice.

          c.   <u>Count Six Is Dismissed as to Defendants Robison and RPD.</u>

In Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. 62), he "withdraws the claims of *Brady* violations as to Officer Robison and the Rexburg Police Department, but maintains the claims against Sid Brown and the City of Rexburg."  Accordingly,

Count Six of the Complaint will be dismissed as against Defendants Robison and RPD, as they requested in their motion for summary judgment.  In light of the Court's dismissal of Counts One and Five, there are no remaining claims against Defendants Robison and RPD and they will be dismissed from this action.

<u>**CONCLUSION**</u>

The Court will not defer consideration of Defendants' motion for summary judgment. Defendants' oral motion to strike Plaintiff's response to Defendants' motion for summary judgment is denied.  Defendants' motion for summary judgment is granted, and Defendants Robison and Rexburg Police Department are therefore dismissed from this action.  Counts One and Five of the Complaint are dismissed in their entirety and Count Six of the Complaint is dismissed as against Defendants Robison and Rexburg Police Department.

<u>**ORDER**</u>

Based on the foregoing, **IT IS HEREBY ORDERED** as follows:

(1) Defendants' oral motion to strike Plaintiff's response to Defendants' motion for summary judgment is DENIED;

(2) Defendants' Motion for Summary Judgment (Dkt. 51) is GRANTED;

(3) Counts One and Five of Plaintiff's Complaint are DISMISSED WITH PREJUDICE;

(4) Count Six of Plaintiff's Complaint is DISMISSED WITH PREJUDICE as to Defendants Robison and Rexburg Police Department; and

(5) Defendants Robison and Rexburg Police Department are DISMISSED from this action.

DATED: March 8, 2021

_____
Honorable Ronald E. Bush
Chief U.S. Magistrate Judge

**MDO RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 51) – 24**